## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Case No. 24-CR-139-1 (TJK)** |
| | : | |
| **JERMAINE HORNE,** | : | |
| **also known as "Guy,"** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION FOR DEFEENDANT JERMAINE HORNE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that defendant JERMAINE HORNE be detained pending trial pursuant to 18 U.S.C. §§ 3142(f)(1)(C) (Serious Drug Felony), 3142(f)(1)(D) (Recidivist), 3142(f)(1)(E) (Involving Possession or Use of a Firearm), and 3142(f)(2)(B) (Serious Risk of Obstruction). The Government requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pretrial detention.

### I.   Introduction and Procedural History

Defendant JERMAINE HORNE is charged by Indictment with for his involvement in three conspiracies. As set forth in Count 1, the first conspiracy began at least back in or around May 2022 and involves HORNE, co-defendant GILBERTO PAZ MADRID, and others conspiring to Distribute and Possess with Intent to Distribute (i) 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, (ii) fifty grams or more of methamphetamine and (iii) 500 grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), 841(b)(1)(A)(vi), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii)(II). As set forth in Count 2, HORNE is also specifically charged with attempting

to Possess with Intent to Distribute 50 grams or more of methamphetamine in October 2023 during this conspiracy.

In addition, as set forth in Counts 3 and 4, the second and third conspiracies began at least back in October 2023 and involve HORNE and co-defendants EDWARD ANDERSON, ROSELLE ARTIS, and others (1) conspiring to Distribute and Possess with Intent to Distribute marijuana and buprenorphine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), 841(b)(1)(D), and 841(b)(1)(E), and (2) conspiring to smuggle prohibited objects to inmates of a federal prisons, including marijuana, buprenorphine, and cellular telephones, in violation of 18 U.S.C. § 371.

Importantly, pursuant to 18 U.S.C. § 3142(e)(3)(A), there is a rebuttable presumption that there is no condition or combination of conditions that will reasonably assure the appearance of HORNE as required and the safety of the community should HORNE be released in this case.

## II.   **Legal Authority and Argument**

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted. *Id.*; *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the Government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *Smith*, 79 F.3d at 1210, *see also Williams*, 798 F. Supp. at 36.

There are four factors under Section 3142(g) that the Court should analyze in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.  18 U.S.C. § 3142(g). As set forth below, a review of these factors shows that HORNE's pretrial detention is appropriate and warranted in this case.

### A.   Nature and Circumstances of the Offenses

This case arises from an investigation by the Federal Bureau of Investigation and law enforcement partners into narcotics trafficking in the Washington, D.C. metropolitan area. As part of the investigation, law enforcement learned that beginning at least back in May 2022, defendant JERMAINE HORNE conspired with others, including co-defendant GILBERTO PAZ MADRID, to traffic large quantities narcotics to the Washington, D.C. area. In addition, the investigation revealed two other conspiracies beginning at least back in October 2023, in which HORNE and co-defendants EDWARD ANDERSON and ROSELLE ARTIS conspired together to traffic narcotics and to smuggle narcotics, cell phones, and other contraband into federal prison facilities. The scope, complexity, and conduct of these schemes strongly favor pretrial detention in this case.

### 1.   Conspiracy to Distribute Narcotics in the Washington D.C. Area (Counts 1 and 2)

#### *Interdiction in Arkansas and Connections to Drug Traffickers*

In February 2022, law enforcement conducted a traffic stop of a vehicle occupied by two male Subjects in Arkansas. During a subsequent search of the vehicle, law enforcement recovered (1) approximately 60 pounds of methamphetamine, (2) approximately 6.5 kilograms of fentanyl pills, and (3) approximately 2 kilograms of fentanyl powder. After being advised of his rights, the driver agreed to make a statement, during which the driver stated that was delivering drugs for a

Mexican organization. The driver also stated that he was previously hired to retrieve bulk cash from a subject in Washington, D.C.; however, that delivery was cancelled because an alternative means of transporting the funds was used. The driver provided a telephone number for the Washington, D.C. subject, which the investigation has revealed was used by HORNE.

Specifically, law enforcement was able to verify that the telephone number provided by the driver was in fact in used by HORNE, and further that the telephone number was also in frequent contact with a Mexican telephone number that was later determined to be connected to a known Mexican drug trafficker. In addition, between June 2021 and July 2022, financial records show that HORNE sent at least $12,050 to this known Mexican drug trafficker in 14 separate Western Union wire transfers.

In November 2022, this known Mexican drug trafficker was recorded in a conversation with co-defendant GILBERTO PAZ MADRID, a Mexican national and federal Bureau of Prisons inmate. PAZ MADRID is currently incarcerated and serving a 120-month sentence of imprisonment following January 2019 convictions for (1) Conspiracy to Distribute and Possess with Intent to Distribute 1 Kilogram or More of Heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1), 841(b)(1)(A)(i), and (2) Attempted Possession with Intent to Distribute 1 Kilogram or More of Heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1), 841(b)(1)(A)(i). *See United States v. Gilberto Paz Madrid*, Case No. 18-CR-317-1 (LMB) (E.D.V.A.). During the call, the Mexican trafficker complained that things are slow and that "PAPI" is not answering his phone. Based on the context of the surrounding conversation, it appears that the Mexican trafficker was complaining to PAZ MADRID that "PAPI" owed him money and was avoiding payment. The Mexican trafficker then gave "PAPI's" telephone number to PAZ MADRID, which was another telephone number known to be used by HORNE.

***Communications Between HORNE, PAZ MADRID, ARTIS, and Others***
***Regarding Drug Trafficking***

The investigation has revealed records of numerous communications related to drug trafficking between HORNE, co-defendant PAZ MADRID, and other subjects since at least 2022 in HORNE's iCloud accounts.

In August 2022, PAZ MADRID asked HORNE for an update about whether HORNE had "send [sic] the strips" to PAZ MADRID, and "Can you send them please." PAZ MADRID also sent HORNE a recipient name and address for the shipment. In response, HORNE sent PAZ MADRID a photograph of a parcel addressed to the same recipient information as provided by PAZ MADRID, along with another photograph that appears to show numerous Suboxone[1] strips in the parcel, as depicted below:

 

HORNE's iCloud records also revealed a series of communications between the Mexican subject and HORNE that demonstrated a pattern of complaints that HORNE was slow in paying what he owed for an unmentioned product. For example:

---

[1]    Suboxone contains buprenorphine, a Schedule III Controlled Substance (https://www.deadiversion.usdoj.gov/drug_chem_info/buprenorphine.pdf).

- On August 4, 2022, the Mexican subject sent HORNE and two other telephone numbers what appeared to be instructions for a payment to a bank account of another subject.

- On August 27, 2022, the Mexican subject told HORNE, "Papi answer me I have problems with these people why is it a long time they want their money."

- On September 9, 2022, the Mexican subject asked HORNE, "Papi I sent you [REDACTED]'s account how are you doing with the above they are asking me."

- On September 21, 2022, the Mexican subject wrote to HORNE: "Daddy answer me I'm telling you that I have problems with these people why haven't they been given their money."

- On November 6, 2022, the Mexican subject told HORNE, "Daddy you're leaving me alone with the debt you owe to these people."

- On November 2 and 4, 2022, the Mexican subject seemed to notify HORNE that he was going to send a courier to HORNE to receive whatever cash he could provide:

  > "Papi these days a person is going so that you have some money please answer the cell phone."

  > "They are going to tell you why they are goin to collect what you have of money."

- On November 5, 2022, HORNE received a message from a number with an El Paso area code: "I'm calling on behalf of Papi got someone ready to pick up the paper."

In addition, on November 21, 2022, during a recorded jail call between PAZ MADRID and the Mexican subject, PAZ MADRID asked the Mexican subject for the telephone number "Papi" (revealed to be HORNE) and also received a telephone number for "Primo," which has been determined to be a telephone number used by ARTIS. The following day, PAZ MADRID placed a call to the telephone number for ARTIS and spoke with "Skeet," during which PAZ MADRID requested that ARTIS visit to "you know what I'm talking about."

PAZ MADRID continued to remain involved in the business HORNE was conducting with the Mexican subject. On March 9, 2023, PAZ MADRID told HORNE in WhatsApp chat: "I already got someone who is going to get them in for me so we can start doing what we were going

to do in Mexico with [REDACTED MEXICAN SUBJECT]." Four days later, PAZ MADRID sent a voice note to HORNE about coordinating a payment from HORNE to another co-conspirator subject: "Hey bro this is the Zelle where you can send the money to [REDACTED MEXICAN SUBJECT]. Let me know."

### *Photographs of Large Quantities of Narcotics and Firearms in HORNE's iCloud*

HORNE's iCloud records also contained multiple photographs of kilogram-size drugs Specifically, a December 2, 2022, photograph depicts two men standing over a brick of a compressed white substance. The brick appears to be stamped with a logo of "23" and also has the characteristics of a kilogram of drugs. The substance in this photograph has reflective texture that resembles cocaine hydrochloride.



Another photograph in HORNE's iCloud records shows HORNE wearing the same red and white sneakers as visible on the person on standing on the right of this photograph, as depicted in the photographs and close-ups below:







In addition, the following two of the photographs in HORNE's iCloud records were taken on May 30, 2023, and depict bricks of a stamped white substance that has the characteristics of a kilogram of drugs. The Government suspects that the substances are bricks of fentanyl based on the appearance in these photographs.

 

As described further below, the investigation has revealed other information, images, and communications that show that HORNE had drugs delivered to, and stored at, 98 Webster Street NE #101, Washington, D.C.

Additionally, HORNE's iCloud records included multiple images of firearms, including but not limited to the following:

  

*Images dated May 1, 2022 (left), January 4, 2023 (middle), and undated (right)*

9

**98 *Webster Street NE, Apt. #101***

98 Webster Street NE, Washington, D.C., is a small apartment building containing eight apartment units. In September 2023, law enforcement learned that two persons—HORNE and ARTIS—had resided at apartment #101, neither of whom was the leaseholder. Investigators also learned that HORNE and co-defendant ARTIS subsequently leased another apartment located across an alley at 85 Hawaii Avenue NE #202. The following image depicts the location and close proximity of the two apartment buildings:



*Map Depicting 98 Webster Street NE (Location A) and 85 Hawaii Street NE (Location B)*

Further investigation determined that apartment #101 had been vacated after HORNE and ARTIS moved out; the power and water turned had been off, and the interior was demolished. The drywall, trim, and the bathroom floor had all been removed. Law enforcement viewed apartment #101 on September 6, 2023, at which time it remained in this condition. There was no sink, bathtub, or even floorboards in the bathroom and one of the plaster walls has been demolished. The apartment did not appear to be habitable at that point.

10

The investigation also revealed that HORNE's iCloud contained records of messages between HORNE and multiple subjects regarding 98 Webster Street NE and the suspected trafficking and distribution of narcotics.  For example, on November 17, 2022, a subject wrote to HORNE, "Make sure I can put it in the spot." HORNE replied, "Come to 98 Webster St around the corner." It appears that the subject wanted to stash drugs at HORNE's apartment in 85 Hawaii Ave NE, but HORNE, who still had access to 98 Webster Street NE, Apt. #101, preferred to put the contraband in that abandoned apartment.

In addition, on August 16, 2022, another subject wrote to HORNE, "I got one of my good men… he trying to get 100g or more." HORNE replied and directed the subject to meet him at "4500 First St NE." That address does not exist, but the entrance of 98 Webster Street NE faces the 4500 block of 1st Street NE. This shows that HORNE, who was probably still using 98 Webster Street NE at the time, directed the subject to that building without revealing HORNE's actual address in order for HORNE to provide the subject with 100 grams or more of drugs.

### HORNE, PAZ MADRID, and Another Subject Coordinate the Shipment of a Parcel to 98 Webster Street NE in June 2023

In May 2023 and June 2023, HORNE exchanged multiple messages with PAZ MADRID regarding the shipment of a package from California to 98 Webster Street NE #101, which investigators believe contained suspected narcotics:

- On May 19, 2023, HORNE sent the address, "98 Webster St NE Washington, DC 20011 Apt 101," to PAZ MADRID and another subject in separate messages.

- On May 25, 2023, the subject told HORNE, "I couldn't send that… Don't think I forgot."

- On May 31, 2023, the subject sent a  request to HORNE, "Bro, I need the name for the paquet [sic]." HORNE replied, "[REDACTED RECIPIENT NAME]… Or just let me know what name you put on there."

- On June 3, 2023, PAZ MADRID wrote to HORNE, "OK bout to send it this morning."

- On June 5, 2023, HORNE sent a screenshot to PAZ MADRID displaying the U.S. Postal Services online parcel tracking service. It showed that a parcel shipped from Panorama, CA had arrived to the 20011 zip code area in Washington, D.C. on June 5, 2023. The website indicated that a delivery attempt was made at 11:56 AM. HORNE added the following text to the screen shot, "It says this but no one showed up I been here since this morning," as depicted below:



That same day, at 12:18 PM, HORNE took two photographs of a person in a vehicle holding a parcel shipped from Panorama, CA to the name and address that HORNE provided to PAZ MADRID at 98 Webster Street NE. #101:



The photographs of this package were preserved in HORNE's deleted items folder. Taken together, these records show that HORNE worked with PAZ MADRID and another subject to have a parcel of suspected drugs sent to 98 Webster Street NE #101 in June 2023.

### HORNE Prepares to Receive a Shipment of Methamphetamine in October 2023

The investigation revealed a series of voice calls between HORNE and PAZ MADRID began in October 2023, during which they appeared to discuss the shipment of a parcel. On October 4, 2023, HORNE sent PAZ MADRID a screenshot that he appeared to have been taken from his phone while HORNE was on a video call with PAZ MADRID.  In a box in the lower right corner of the screen, PAZ MADRID's face can be seen, superimposed by a smaller box showing HORNE's face. The image (left) and a close-up of the image (right) are depicted below:



On October 8, 2023, HORNE and PAZ MADRID communicated in a series of WhatsApp chats and video calls. The content of some of the chats was not preserved in HORNE's iCloud records and therefore the dialogue of their conversation was not captured. However, images of shipping labels, a label printer and packaging material were sent from PAZ MADRID to HORNE

13

during those discussions, which indicate that the topic of conversation involved sending a parcel via the U.S. mail.

  

Notably, the image on the right appears to be a screenshot that PAZ MADRID captured during a video call with HORNE, who appears to be depicted in the lower left corner of the image.

In addition, on the evening of October 8, 2023, HORNE was on a Facetime video call with an unknown subject who held a piece of a white crystalline substance resembling methamphetamine in front of their camera so that HORNE could get a close look at it. HORNE preserved the image by taking two screenshots during the call, as depicted below. Over the next two days, HORNE sent one or both of the screenshots to four of his associates, one of whom is an inmate in FCI Fort Dix who was arrested in 2019 for distribution of, among other drugs, methamphetamine.

14



***Parcel Delivery to 98 Webster Street NE, Apt. #101 in October 2023***

On the morning of October 11, 2023, investigators learned that a parcel addressed to 98 Webster Street NE #101 was enroute to be delivered. Surveillance was established around the apartment building. A white BMW SUV with Virginia tags in the rear and no tags in the front was seen circling the neighborhood. Law enforcement observed that HORNE was in the front passenger seat of the vehicle. The vehicle drove past 98 Webster Street NE five times in approximately two hours.

In addition, on the morning of October 11, 2023, at approximately 10:35 AM, ARTIS sent a message to HORNE asking, "Yo, we still on?" HORNE replied to ARTIS, "yeah."

On October 11, 2023, at approximately 1:15 PM, a postal carrier delivered the parcel addressed to 98 Webster Street NE #101 to the resident of 98 Webster Street NE #102. The parcel was subsequently abandoned and seized by investigators. The parcel was searched the following

day pursuant to a search warrant. The parcel contained two bags of a crystalline substance that tested presumptively positive for the presence of methamphetamine. Each bag weighed approximately one pound. The substance was tested at the DEA Mid-Atlantic Laboratory and found to be approximately 98% methamphetamine with a total weight of approximately 889.36 grams.



In addition, the investigation has revealed that an IP address used by an associate of HORNE queried the status of the parcel on the USPS website approximately 19 times between October 10, 2023, at 6:42 PM and October 11, 2023, at 11:53 AM.

### *Confidential Sources Plan a Drug Shipment with PAZ MADRID and HORNE in February and March 2024*

Beginning on February 14, 2024, a confidential source ("CS-1") reached out to PAZ MADRID by sending a WhatsApp message to PAZ MADRID's contraband phone in prison. CS-1 claimed to have received PAZ MADRID's number from a mutual acquaintance and explained that CS-1 was hoping that PAZ MADRID could introduce CS-1 to drug customers in the United States. PAZ MADRID and CS-1 then spoke via a WhatsApp voice call. In sum and substance, PAZ MADRID assured CS-1 that PAZ MADRID had a connection in the United States who could

distribute both "F" (understood to mean fentanyl) and "blanco" (the Spanish word for "white," understood to mean cocaine.)

In a subsequent call, PAZ MADRID added HORNE to create a three-party conference call. PAZ MADRID introduced HORNE as "Guy." PAZ MADRID advised HORNE that CS-1 wanted to know about prices of drugs in HORNE's area. HORNE responded that things were going for less than before, "18 or 17-five." PAZ MADRID translated HORNE's response in Spanish for CS-1, indicating the price would be between $17,000 and $18,000 per kilogram of cocaine.

PAZ MADRID asked HORNE what HORNE could do if CS-1 delivered some "pieces" (understood to mean kilograms) to HORNE. HORNE replied, "You already know…" PAZ MADRID stated that he wanted CS-1 to hear it. HORNE then stated that he would, "make them go as fast I can and get the papers straight to him." Later in the conversation, PAZ MADRID advised CS-1 that HORNE and his associates could assist CS-1 with the "F" and "cuadros" (meaning fentanyl and kilograms). After the call, PAZ MADRID sent "Guy's" number to CS-1 via WhatsApp text.

In the following weeks, PAZ MADRID and CS-1 continued to exchange messages and voice calls. PAZ MADRID instructed CS-1 to reach him on a different phone number. PAZ MADRID continued to express interest in connecting CS-1 to PAZ MADRID'S customer in the United States (HORNE) but also expressed concern about conducting illicit business with a new partner. PAZ MADRID asked for clarification on who gave PAZ MADRID'S number to CS-1 and wanted to speak to the individual. CS-1 maintained a story that he received PAZ MADRID's number from someone who was incarcerated in Mexico who had mutual acquaintances with PAZ MADRID. Eventually, PAZ MADRID decided to proceed with the purported drug transaction in

17

the United States. CS-1 indicated to PAZ MADRID that CS-1 would like to have CS-1's courier in the United States reach out to HORNE. PAZ MADRID agreed.

On March 6, 2024, another confidential source ("CS-2") reached out to HORNE. CS-2 played the role of a courier working for CS-1. CS-2 told HORNE that CS-2 got HORNE's number from CS-1. HORNE acknowledged by saying "Ya, he told me, I was waiting on your call." The two discussed the quantity of drugs that CS-2 would deliver to HORNE. CS-2 asked, "So what you need?" HORNE replied, "He told you right? He was saying you were bringing four." CS-2 asked, "Four or five?" HORNE said, "I thought he said four but five, that's cool." CS-2 and HORNE also discussed the type of drug that CS-2 would deliver. CS-2 clarified that CS-2 was told to deliver "F" (meaning fentanyl). HORNE responded that he was expecting "Up" (believed to mean cocaine). CS-2 ended that call by telling HORNE that CS-2 needed to make sure everyone was on the same page and would call HORNE back.

Following the call with HORNE, CS-2 called PAZ MADRID. CS-2 and PAZ MADRID discussed the type of drug that CS-2 would deliver to HORNE. PAZ MADRID advised it would be the "blanco" (cocaine). CS-2 and PAZ MADRID also discussed the quantity. CS-2 advised that CS-2 would deliver four if CS-1 approved.

After speaking with PAZ MADRID, CS-2 spoke again with HORNE. CS-2 advised HORNE that CS-2 had spoken with CS-1 so that they could be "on the same page" and that CS-2 would "be taking the four." HORNE clarified "of the 'up,' right?" CS-2 expressed uncertainty with the term "up" and told HORNE that CS-2 wanted to be sure CS-2 was transporting the correct material. HORNE asked CS-2 if CS-2 had FaceTime and told CS-2 that he was calling CS-2 via FaceTime at the moment. CS-2 switched to the FaceTime call and continued collecting an audio recording. HORNE spoke more candidly over FaceTime and asked, "You're talking about the

'coke,' right?" CS-2 acknowledged, "Ya, so that's four coke." HORNE then asked CS-2 if he also had "fent." CS-2 replied, "Fent?" HORNE elaborated, "You got fentanyl, too?" CS-2 replied that CS-2 did and HORNE told CS-2 to "bring one of them." CS-2 agreed. HORNE then assured CS-2 that "if the fentanyl is good like it's supposed to be... shit, we gonna bring some more, you hear me?" CS-2 concluded the conversation by explaining that CS-2 would be passing through Washington the following week and would get in touch with HORNE.

On March 12, 2024, CS-2 called HORNE. HORNE asked CS-2 when he would arrive (in Washington, D.C.). CS-2 told HORNE that it would be the following morning. HORNE replied, "Alright, cool. Just hit me and let me know and I'll let you know where to come at." CS-2 confirmed that CS-2 was bringing "four of... you know what I mean" and "one of fent." HORNE acknowledged with "Ya, ya, ya."

On March 13, 2024, CS-2 called HORNE to consummate the deal they had discussed. HORNE did not answer, but immediately called CS-2 via FaceTime. CS-2 told HORNE that CS-2 was in Washington, D.C., ready for HORNE, and that CS-2 would send HORNE the address of where to meet. HORNE replied, "Alright, bet.  We'll make sure it's a safe spot... a safe location. Just send me the address."

CS-2 also spoke with PAZ MADRID, during which PAZ MADRID advised CS-2 that he would send CS-2 the location of PAZ MADRID's "camarada" (HORNE). PAZ MADRID advised that HORNE was about two minutes from the location CS-2 sent to PAZ MADRID. CS-2 responded that CS-2 did not know the area and did not want to move around. PAZ MADRID asked CS-2 if CS-2 had four. CS-2 responded that CS-2 had four of cocaine and one of fentanyl.

HORNE and CS-2 connected again, during which HORNE urged CS-2 to leave and come to him. When CS-2 refused, HORNE complained, "That spot ain't a good spot. You right beside

a station. You right beside an FBI station." CS-2 asked, "What?" and HORNE emphasized, "You beside a police station. There's a police station right beside you… FBI." CS-2 stated that CS-2's instructions from CS-1 were not to leave the location.

Following the conversation with HORNE, CS-2 spoke with PAZ MADRID about not moving from CS-2's location. PAZ MADRID advised that his associates were trying to take precautions so that everything went well, and further that CS-2 was near a federal law enforcement office, so it would e better for CS-2 to change locations.

CS-2 then called HORNE, during which HORNE stated the following, in sum and substance:

- You're still going to be safe anyway.  I'm telling you it's safe for both of our protection, you here me?  Like 295 still… where you meet me at, it's still, it take you straight right there with no problem.

- Ya, you right around the corner.  I'm just trying to make it safe for you and make it safe for me.

- (UI) back on the highway.  Hey look, like I told you, like this my area, right?  If you don't come out with that I'm cool, man.  I'll catch you all on the beat down.

- I say if you can't really come where I'm at I'm cool because that ain't no good spot where you at.

- Ya.  Or you can… you want to take it back with you?  Because that area ain't no good.  Ain't no good at all.

At approximately 11:30 AM, law enforcement observed HORNE departing 85 Hawaii Avenue NE #202 with ANDERSON and driving away in a black Nissan Armada with Maryland tag 4GA8520.

At approximately 11:50 AM, HORNE called CS-2 back and tried once more to convince CS-2 to come to him. CS-2 stated that CS-2 would take the drugs to New York if HORNE did not

20

make it to the location soon. HORNE then asked what room CS-2 was in and stated he would be there in 30 minutes.

At approximately 12:30 PM, the black Nissan Armada was observed driving past CS-2's location with HORNE as the driver and ANDERSON as a passenger. In addition, court-authorized surveillance of location data for HORNE's cellular telephone showed that it was near the location. Around that time, HORNE called CS-2 and said "I'm about to come to the door now." However, HORNE never arrived at the location and then stopped answering CS-2's calls.

### 2. Conspiracy to Distribute Narcotics and to Smuggle Narcotics and Contraband into Federal Prison Facilities (Counts 3 and 4)

Since at least October 2023, HORNE, ANDERSON, and ARTIS have engaged in a conspiracy to distribute drugs and to smuggle contraband including Suboxone, marijuana, cell phones, and other prohibited items into federal prisons.

#### *October 2023:  Search of ANDERSON's Residence*

On October 25, 2023, law enforcement executed a federal search warrant at ANDERSON's residence located in Mount Rainier, Maryland. During the search, law enforcement located items including but not limited to the following: a plastic bag containing a light brown powdery substance; 20 small rock-like substances individually wrapped; 3 small vials of brown liquid; various items containing cocaine residue; a plastic bag containing marijuana; and a clear container containing a white powdery residue. In addition, investigators found a SwellPro aerial drone, as depicted below:

 

*October 2023:  Nash County, North Carolina*

On October 29, 2023, court-authorized surveillance of location data for HORNE's cellular telephone showed that the phone traveled from the Washington, D.C. area to and an area near the border of South Carolina and Georgia. At some point that night or the next morning, location reports showed that the phone was within the error radius of FCI Edgefield, located in Edgefield, South Carolina. At 2:36 AM, a license plate reader recorded that ARTIS's vehicle, a black Honda Civic with DC tag JC-0795, was parked in a hotel parking lot in Augusta, Georgia.

On October 30, 2023, the Nash County Sheriff's Office conducted a traffic stop of ARTIS's vehicle while it was traveling on I-95 northbound. ARTIS was the driver; HORNE and ANDERSON were passengers. Law enforcement smelled an odor consistent with the smell of marijuana from the vehicle and conducted a search of the vehicle, during which officers located and seized items including but not limited to the following: a SwellPro aerial drone; approximately 521 units of Suboxone; approximately 89 grams of marijuana; approximately 14 cell phones (in the trunk); and red and black bolt butters (in the trunk).

  

***November 2023:  FCI Fort Dix, New Jersey***

On November 12, 2023, court-authorized surveillance of location data for HORNE's cellular telephone showed that the phone traveled to the vicinity of FCI Fort Dix located on Joint Base McGuire Dix Lakehurst (JBMDL) in New Jersey. Investigators notified the Air Force Office of Special Investigations ("OSI") and FCI Fort Dix, and patrols were dispatched. FCI Fort Dix prison guards reported observing a drone take off, but no subjects or contraband was located.

On November 15, 2023, investigators again observed location data for HORNE's cellular telephone that showed the phone traveled to the vicinity of FCI Fort Dix on JBMDL. Investigators notified Air Force OSI and patrols were dispatched. OSI located HORNE and ANDERSON just outside of FCI Fort Dix in a 2020 Hyundai bearing DC tag JD 3637. During a search of the vehicle, law enforcement seized items including but not limited to the following:  a SwellPro aerial drone; and two bundles of contraband containing 10 cell phones and chargers wrapped in tobacco.

 

*March 13, 2024:  Search of 85 Hawaii Avenue NE #202*

On March 13, 2024, following the attempted controlled sale of narcotics to HORNE, law enforcement executed a court-authorized search warrant at 85 Hawaii Avenue NE #202, Washington, D.C. The investigation revealed that ARTIS signed a lease, dated August 1, 2022, for apartment #202. In addition, the ledger for apartment #202 lists ARTIS as the tenant with a move in date of August 1, 2022 and a lease expiration of July 31, 2023.  Two telephone numbers are listed for the tent on the ledger, including a telephone number known to be used by HORNE.

The investigation revealed multiple other connections between HORNE, ARTIS, and ANDERSON to apartment #202. A photograph in HORNE's iCloud depicts a May 8, 2023 notice from the property manager addressed to "Jermaine Horne" at "85 Hawaii Ave Apt 202" regarding complaints of excessive noise and undocumented pets at the premises. In addition, in February and March 2024, law enforcement surveillance observed HORNE, ANDERSON, and ARTIS entering and/or exiting the premises.

On March 13, 2024, HORNE, ARTIS, and ANDESON were all present in apartment #202 at the time that the search warrant was executed. During the search, investigators found items including but not limited to the following: a loaded Draco firearm; approximately 1.8 kilograms

24

of marijuana; approximately 210 doses of Suboxone; multiple quantities of narcotics that field tested positive for the presence of dimethylpentylone and/or fentanyl; packaging material, a heat sealer, digital scales, and masks; two SwellPro aerial drones; cell phones in a sealed package; and red and black bolt cutters.



 

 

 

 

 

In addition, a blue Porsche Cayenne SUV, known to be driven by HORNE, was parked outside of the apartment.  HORNE offered his consent to a search of the vehicle.  Another scale and a glass vile containing approximately one gram of dimethylpentylone were found inside the Porsche.

Additionally, the black Nissan Armada that HORNE and ANDERSON drove near the site of the drug transaction with CS-2 earlier that day was also parked outside of 85 Hawaii Avenue NE. None of the occupants admitted to using the vehicle, although the keys for the vehicle were located inside the apartment. Investigators subsequently determined that the vehicle was rented by the mother of one of HORNE's children. The vehicle was subsequently searched with negative results.

**B.**    **Weight of the Evidence**

The weight of the evidence against HORNE in this case also clearly favors pretrial detention. As recently clarified by former-Chief Judge Howell, this factor is a "common-sense" consideration that, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *United States v. Blackson*, No. 23-cr-25 (BAH), 2023 WL 1778194, at *10 (D.D.C. Feb. 6, 2023) (Howell, C.J.), *aff'd*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023).

As summarized above, the evidence against HORNE in this case is very strong. HORNE has been indicted for multiple serious violations of the Controlled Substances Act as well as for conspiring to smuggle contraband into federal prison facilities. A package containing approximately 889 grams of methamphetamine was seized by law enforcement when the HORNE attempted to have the drugs mailed to a known stash house in the District of Columbia. Moreover, HORNE recently attempted to buy four kilograms of cocaine and one kilogram of fentanyl from a confidential source in the District of Columbia during a law enforcement operation, which is corroborated by numerous recordings. Additionally, multiple photographs of firearms and large

quantities of drugs were found in HORNE's iCloud records, as depicted above. This establishes that HORNE was adept at obtaining large amounts of multiple kinds of dangerous drugs, to include methamphetamine, cocaine, and fentanyl, and that he did so while also in possession of firearms. *See* 18 U.S.C. § 3142(e)(3)(A); *United States v. Brown*, 538 F. Supp. 3d 154, 165 (D.D.C. 2021). Even the possession with intent to distribute "9.11 grams of fentanyl and .89 grams of powdered cocaine" triggers such a presumption. *Brown*, 538 F. Supp. 3d at 165-66. Here, the Government has presented compelling evidence that HORNE conspired to traffic four kilograms of cocaine, one kilogram of fentanyl, and nearly a kilogram of methamphetamine during the course of the conspiracy.

Finally, in addition to the recorded phone calls, the evidence obtained from HORNE's iCloud account, and the seized narcotics, additional evidence was obtained during the search of one HORNE's stash houses at 85 Hawaii Street NE #202. During the search, law enforcement located items including, but not limited to, a loaded Draco firearm, numerous narcotics, packaging and distribution supplies, aerial drones, and bolt cutters. HORNE was also located in apartment #202 both before and after the attempted drug transaction with CS-2 that day. *See United States v. Raymond Nava, Jr. and Max Carias Torres*, No. 23-cr-73-4, -6 (CKK) (holding that no condition or combination of conditions could be imposed that would reasonably assure the safety of the community if the defendants were released pending trial, in a case where one or both of the defendants were engaged in a conspiracy to distribute 400 grams or more of fentanyl, had access to firearms, had prior gun offenses, and had ties to Mexico.) (D.D.C. Apr. 23, 2023) (Kollar-Kotelly, J.) Accordingly, this factor strongly favors pretrial detention. *See United States v. Zhe Zhang*, 51 F. 4th 141 (2d Cir. 2022) (holding that each factor is to be given equal weight).

C.    **The Defendant's History and Characteristics**

The Pretrial Services Agency has confirmed that HORNE has an extensive criminal history. Specifically, HORNE has seven prior convictions: (1) Assault with a Dangerous Weapon and Contempt (D.C. 2018); (2) Operating After Suspension (D.C. 2014); (3) Controlled Substance Possession-Not Marijuana (MD 2011); (4) Attempted Possession with Intent to Distribute Cocaine (D.C. 2006); (5) Possession with Intent to Distribute Cocaine (D.C. 2006); (6) Possession of Marijuana (D.C. 2003); and (7) Possession of Marijuana (D.C. 2000). Therefore, this factor also weighs in favor of detention. *See, e. g., United States v. Spear*, 2020 WL 7640875 at *2 (D. Col.) ("Even though the defendant's felony convictions are eleven years old, they are for the sale of a controlled substance and possession with intent to sell a controlled substance . . . The fact that these convictions involve essentially the same charges as the drug charges in this case, demonstrates that the defendant is a danger to the community if released based on the risk that he will continue to deal drugs."); *United States v. Anderson*, 2019 WL 4655900 (N.D.W.V.) (12 year old conviction weighed in favor of detention when it was similar to the charged offense); *United States v. Russell*, 2021 WL 5447037 (N.D. Ill.) (20 year old conviction weighs in favor of detention).

The defendant's lengthy criminal history shows a pattern of dealing drugs. Moreover, the investigation has shown that HORNE has been actively conspiring to distribute drugs in the District of Columbia area for at least the past two year, in addition to expanding his business to attempt to smuggle drugs and other contraband into prisons in various other states.

Notably, HORNE's most recent conviction in July 2018, D.C. Superior Court Case No. 2017 CF2 017130, was for Assault with a Dangerous Weapon and Contempt. HORNE was sentenced to 30 months of imprisonment and 12 months of imprisonment respectively for each

offense, to run consecutive. This means that HORNE had only been out of prison for a short period of time when he chose to re-establish his drug dealing business. In fact, HORNE was on probation for this offense until December 1, 2023, meaning that he was actively engaged in a serious and substantial drug dealing conspiracy while on probation.

Even more troubling however, is HORNE's prior conviction for contempt. In that case, HORNE pulled a gun on a victim who was giving him a ride, when the police attempted to pull over the car they were driving in. Not only was HORNE trying to flee from a police stop, but he pulled a gun on the victim and demanded that he drive away in order to do so. However, HORNE's criminal actions did not stop there. After he was arrested and charged with this offense, HORNE attempted to use family members and friends to coerce the victim into dropping the charges against him. These actions all demonstrate that HORNE has little to no regard for the law, court orders, or the safety of others in the community. And the fact that HORNE chose to enter into a narcotics conspiracy while on probation establishes that no amount of supervision will stop him from continuing these crimes going forward. Moreover, the fact that HORNE has plead guilty to contempt for essentially witness tampering shows that he will attempt to break the law and defy court orders even while incarcerated. Given HORNE's criminal history and prior conduct, the only way that the Court can attempt to ensure the safety of the community and the defendant's appearance as required in this case is to detain him pending trial in this case.

### D.   Danger to the Community

The nature and seriousness of the danger to any person or the community posed by the defendant's release also strongly favors pretrial detention. Based on Counts 1, 2, and 3, there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of [HORNE] as required and the safety of the community" where a judicial officer

determines that there is probable cause to believe that the person committed the charged offense. 18 U.S.C. § 3142(e)(3)(A). Under the Bail Reform Act, "[t]he statutory language, as well as the legislative history, unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community." *United States v. Strong*, 775 F.2d 504, 506 (3d Cir. 1985). Legislative history also "fully supports the conclusion that Congress intended to equate drug trafficking with danger to the community." *Id.* at 507; *see also United States v. Alatishe*, 768 F.2d 364, 370 n.13 (D.C. Cir. 1985) (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 20 (1983), U.S. Code Cong. & Admin. News 1984, p. 3203); *United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021) (recognizing that "threat of dealing drugs" represents a danger to community warranting pretrial detention).

Moreover, in this case the drug trafficking that the defendant was engaged in included large quantities of methamphetamine, cocaine, and fentanyl. "It is well recognized that drug trafficking presents a danger to the community." *United States v. Bell*, 209 F. Supp. 3d 275, 279 (D.D.C. 2016) (Bates, J.) (citing cases). Most importantly, fentanyl is an extremely dangerous and lethal narcotic. Just two milligrams can be fatal. *See United States v. Glasgow*, 2021 WL 2403136 at *7 (D.D.C.) (Lamberth, J.). Conspiring to distribute fentanyl presumptively renders a defendant a serious danger to the community. *See Brown*, 538 F. Supp. 3d at 170; *cf. also United States v. Bethea*, 763 F. Supp. 2d 50, 54 (D.D.C. 2011) (narcotics trafficking generally).

At this point in the opioid epidemic, it is common knowledge that fentanyl kills. According to the DEA, "Fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a

person's body size, tolerance and past usage."[2] According to the Centers for Disease Control, D.C. ranks number one in the nation for drug overdose deaths, based on the age-adjusted rate of deaths per 100,000 persons in 2021.  For opioid overdose deaths specifically in 2021, D.C. ranks number two in the nation, trailing just behind West Virginia by 7%.[3]  In 2022, D.C. had a record 448 opioid overdose deaths – on average, 37 opioid overdose deaths per month.[4]  This is up from 427 in 2021, and 411 in 2020, according to the city's medical examiner. Six out of ten fentanyl-laced fake prescription pills analyzed contain a potentially lethal dose of fentanyl.[5]  Here, the evidence indicates that the defendant was engaged in distributing kilogram levels of methamphetamine, cocaine, and fentanyl.

The presumption is rebuttable and does not shift the ultimate burden of proof from the Government. But it does create a burden of *production* on the defense to submit at least some credible evidence that might purport to overcome it. And even if the defense does submit such evidence, the presumption remains as a factor that may be considered by the Court among others in determining whether the defendant should be detained, and the presumption retains "evidentiary weight." *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991) ("When a defendant produces such evidence, however, the presumption does not disappear. The burden of persuasion remains on the government and the rebutted presumption retains evidentiary weight") (citations omitted); *United States v. Rueben*, 974 F.2d. 580, 586 (5th Cir. 1992) (the mere production of evidence

---

2   https://www.dea.gov/resources/facts-about-fentanyl

3   https://www.wusa9.com/article/news/local/dc-health-advocates-urge-mayor-to-declare-opioid-crisis-a-public-health-emergency/65-8cad9abd-af25-4013-bcb1-51e8e67dfa84;
https://www.cdc.gov/drugoverdose/fatal/dashboard/index.html

4   https://www.wusa9.com/article/news/local/dc-health-advocates-urge-mayor-to-declare-opioid-crisis-a-public-health-emergency/65-8cad9abd-af25-4013-bcb1-51e8e67dfa84; https://www.washingtonpost.com/dc-md-va/2023/04/04/dc-vending-machine-opioids-narcan/

5   https://www.dea.gov/onepill

[regarding flight risk for a drug offense] does not completely rebut the presumption . . . . In making its ultimate determination, the court may still consider the finding by Congress that drug offenders pose a special risk of flight and dangerousness to society" (citation omitted); *United States v. Rodriguez*, 950 F.2d 85, 88 (2nd Cir. 1991) ("Although the government retains the burden of persuasion, a defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption . . . Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant. . . .); *see also United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir.1985) (rejecting "bursting bubble" approach)" (internal citation omitted)); *United States v. Ali*, 793 F.Supp.2d 386, 388 and 388 n.2 (D.D.C. 2011) ("Even if such contrary evidence or credible proffers are offered, the presumption remains as a factor to be considered by the Court amongst others in determining whether the defendant should be detained").

Here, this factor weighs strongly in favor of detention. The evidence shows that the defendant is a key player in a significant drug trafficking conspiracy involving large quantities of fentanyl, cocaine, and methamphetamine, some of the most dangerous drugs. The investigation has also revealed multiple connections between HORNE and firearms during the time period of the conspiracy, including a loaded Draco firearm present in 85 Hawaii Avenue NE #202 as recently as on March 13, 2024, which further poses a danger to the community.

## **CONCLUSION**

The Government respectfully requests that the Court grant its motion that defendant JERMAINE HORNE be held without bond pending trial.

Respectfully submitted,

MATTHEW GRAVES,
UNITED STATES ATTORNEY

By:     */s/ Alicia M. Long*
        ALICIA M. LONG
        THOMAS G. STRONG
        Assistant United States Attorneys
        D.C. Bar Number 1659433 (Long)
        United States Attorney's Office
        601 D Street NW
        Washington, DC 20530
        Telephone:  202-252-6889
        Email:  alicia.long@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of the foregoing to be served upon counsel of record via the Electronic Case Filing (ECF) system on March 26, 2024.

By:   <u>*/s/ Thomas G. Strong*      </u>
　　　Thomas G. Strong
　　　Assistant United States Attorney